Carmine P. RICCA and Christine M. Ricca, Plaintiffs,

v.

UNITED STATES of America, Federal Drug Enforcement Administration, Carlo Boccia, Andrew Andalaro, Thomas O'Brien, Louis Dell'Ermo and James Bradley, Defendants.

No. 75 C 314.

United States District Court, E. D. New York.

April 29, 1980.

Lipsig, Sullivan, Mollen & Liapakis, New York City, by Jay W. Dankner, Bennett J. Wasserman, New York City, for plaintiffs.

Edward R. Korman, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., by Abraham Y. Skoff, Asst. U. S. Atty., Brooklyn, N. Y., for defendants United States of America and Federal Drug Enforcement Administration.

Schulte & McGoldrick, New York City, by John S. Martin, Lisa Kolb Liebert, New York City, for defendants Boccia and Bradley.

John J. Degnan, Atty. Gen., State of New Jersey, Trenton, N. J., by ALfred Abbotts, Deputy Atty. Gen., Trenton, N. J., for defendants Andalaro and O'Brien.

Salvatore Perillo, Corp. Counsel, City of Newark, Newark, N. J., by John C. Pidgeon, Asst. Corp. Counsel, Newark, N. J., for defendant Dell'Ermo.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

This action for damages against the United States and its agents arises out of an incident that occurred on February 28, 1974, when federal agents and State police members of a Federal Narcotics Task Force stopped Carmine Ricca in his automobile on a public street in Kearny, New Jersey. Plaintiffs allege that for some time prior to stopping him, the defendants had maintained surveillance on Ricca and had followed him in the mistaken belief he was a known fugitive, one John Tully. Plaintiffs claim that, after Ricca's car was stopped, defendants surrounded the car and ordered him out of it. Finally, it is contended that the defendants failed to identify themselves as law enforcement officers and that one or more of the defendants, after pointing firearms at Ricca, shot him.

Initially, the federal defendants, jointly represented by the United States Attorney moved to dismiss the complaint pursuant to Rules 12 and 56, F.R.Civ.P., on a variety of grounds. As to the claims against the United States (or "government") and the Drug Enforcement Administration ("DEA"), the government claimed the complaint was entirely deficient and thus should be dismissed outright. As to the individual DEA agents, James Bradley and Carlo Boccia ("federal agents"), the government contended dismissal was appropriate as to each cause of action except the sixth cause which alleges what has come to be known as a *"Bivens"* action for violation of Fourth Amendment rights. See *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). With respect to that cause of action, the government recognized that the agents must rely at trial on the "good faith" immunity defense set out in *Bivens v. Six Unknown Named Agents*, 456 F.2d 1339 (2d Cir. 1972).

The government's theory of the case, of course, had the effect of casting the individual federal defendants into potential liability while absolving the United States of any responsibility for their actions. Finding themselves in an antagonistic position vis-a-vis the United States, the federal defendants have obtained separate representation and oppose that portion of the United States' motion seeking dismissal of plaintiffs' second cause of action which claims negligence. Because of facts peculiar to this case, resolution of the government's motion for summary judgment on the second cause of action is critical and thus we turn to it at the outset.

The United States moves against the "negligence" claim on the ground that it has not consented to a suit which in reality seeks recovery for injuries arising from an assault and battery. Its argument is based on the express limitation to the waiver of immunity in the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, contained in § 2680(h), which at the time this action arose excluded from any waiver of immunity

"claims arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

Although the section was amended on March 16, 1974, it provided a waiver of immunity only for claims "arising, on or after [that] date . . . out of assault, battery, false imprisonment, false arrest . . . ." allegedly committed by law enforcement officers of the United States. Thus, the government contends, the amendment to the Tort Claims Act does not apply to actions such as this arising out of incidents that occurred prior to the amendment. See *Gaudet v. United States*, 517 F.2d 1034 (5th Cir. 1975); *Pennington v. United States*, 406 F.Supp. 850 (E.D.N.Y. 1976); *Dupree v. Village of Hempstead*, 401

F.Supp. 1398 (E.D.N.Y.1975). The success of the United States' motion manifestly depends on the validity of its argument that on the facts and law plaintiffs' claim of negligence is but artful pleading designed to circumvent the Act's bar to suits such as this. After careful review of the extensive material disclosed by discovery in this case and consideration of applicable law, the court concludes for the following reasons that summary judgment dismissing the second cause of action is inappropriate at this time and the government's motion must be denied.

The United States argues—and the federal agents agree—that in determining the applicability of the § 2680(h) exception,

"a court must look, not to the theory upon which the plaintiff elects to proceed, but rather to the substance of the claim which he asserts."

*Lambertson v. United States*, 528 F.2d 441, 443 (2d Cir. 1976). See *Blitz v. Boog*, 328 F.2d 596, 599 (2d Cir.), *cert. denied*, 379 U.S. 855, 85 S.Ct. 106, 13 L.Ed.2d 58 (1964). Accordingly, we have scrutinized the record and accept for purposes of this motion what the United States urges as "plaintiffs description" of the action, *viz.*:

"This is an action for personal injuries sustained by the plaintiff CARMINE P. RICCA and for loss of consortium sustained by his wife, CHRISTINE M. RICCA. These damage claims arise out of a shocking set of events whereby the plaintiff, a 25 year old school teacher in New Jersey became the unfortunate target of a joint federal, state and local police investigation on the mistaken belief that he was John Patrick Tully, a notorious criminal indicted by the New Jersey State Grand Jury for four murders. Tully was known to have been deeply involved with organized crime activities in the State of New Jersey and was also under federal indictment for illicit drug trafficing [sic]." Wasserman Aff., ¶ 2.

Or, as put by defendants Bradley and Boccia:

"Plaintiff was injured by a bullet during an incident in Kearney, New Jersey, which occurred when defendants Boccia and Bradley and other members of a Federal Narcotics Task Force attempted to stop plaintiff Carmine Ricca ('Ricca').

"Prior to the incident in question, agents Boccia and Bradley had received information identifying Ricca as a known and dangerous fugitive, sought by state and federal authorities for various murder, narcotics and other charges related to organized crime. Acting on this information, the individual defendants placed Ricca under surveillance as he drove away from what was believed to be his residence. When it appeared that Ricca was attempting to avoid apprehension by driving at high speed and through red lights, the task force approached and attempted to stop his vehicle. After Ricca's car had been stopped, Agent Bradley stood in front of the car pointing his gun at Ricca. Suddenly, the car accelerated toward Agent Bradley and as he sought to avoid being hit by the car, his gun discharged and the bullet struck plaintiff."

Memorandum of defendants Bradley and Boccia in Opposition to the Government's Motion to Dismiss Claims as against the United States ("Bradley/Boccia Memorandum"), p. 3.

As described by defendants O'Brien and Andalaro:

"This action arises out of the shooting of plaintiff on February 28, 1974 in the town of Kearny, New Jersey.

\*     \*     \*     \*     \*     \*

"Prior to the shooting incident in question, a tentative identification had been made that plaintiff was John Tully, a fugitive. Individual defendants and others made an attempt to further determine if plaintiff and Tully were, in fact, one and the same. The climax of this attempt was a confrontation between plaintiff and the individual defendants at the intersection of Boyd and Chestnut Streets in Kearny. At that place, one government vehicle was placed in front of plaintiff's stopped vehicle and another pulled up to the rear. The individual

defendants then got out and took up positions around plaintiff's car and demanded that he get out. . . ."

Memorandum on Behalf of Defendants O'Brien and Andalaro in Response to Motions Brought by the United States Attorney ("O'Brien/Andalaro Memorandum"), p. 2.

In a tape-recorded statement given to Detective John Mooney of the Kearny Police Department, plaintiff Ricca described the circumstances surrounding the shooting in part as follows:

"I drove on Devon St. to Boyd and I made a left and I stopped at the stop sign. While I was stopped there I put my car in first gear, I noticed a car, a blue Chevelle pulled up next to me and a guy jumped out of the passenger side and he started to bang on the driver side window. He told me to get out of the car and another man came around the front of the car and he started to point a gun at me, so I didn't know, I told them who I was, I told them what did I do and they just keep swearing and they told me to get out of the car, we are going to fuck you up.

"I had three hundred dollars in my pocket and I didn't know what they wanted me for. I turned my steering wheel to the right and tried to slide onto the passenger seat and drive away."

"QUESTION: Did these men identify themselves to you?

"ANSWER: No, they did not identify themselves.

"O.K. Continue.

"When I tried to get away somebody shot me through the passenger, through the driver's side window and then he punched me in the side of the head. He opened the door and he grabbed me by the lapels of my coat and he dragged me out of the car, he spun me around and he pushed me onto the hood of the car and my face was lying in a big puddle of blood, so I knew that I was bleeding. He took my identification out of my pocket and then he made me sit on the car, he made me sit on the street. He wouldn't let me get my

handkerchief out of my pocket to put on my ear because I was bleeding. Then the Kearny Police ambulance came and I went to the hospital.

Plaintiff described the incident similarly in his administrative claim underlying the present action:

"RIDER TO CLAIM FOR DAMAGE OR INJURY

"Re: *CARMINE P. RICCA, JR. and CHRISTINE M. RICCA*

"6. Upon information and belief, claimant Carmine P. Ricca, Jr. was shot by one James Bradley, a federal officer who with four others apparently constituting a Drug Enforcement Administration Task Force were seeking to apprehend a known criminal, one John Tully. Without taking proper precautions to identify the claimant the said Task Force did recklessly proceed to trail the claimant on his way to his mother's home in his car. The officers, in civilian attire, abruptly and without warning cut off claimant's car and without identifying themselves as law enforcement officers proceeded to bang on claimant's car window, curse and yell at him and point pistols directly at the claimant causing claimant to protectively shift his position to avoid the pistol's possible discharge. The claimant's actions caused his car to move when one of the officers without warning shouted 'shoot him' and the claimant was then shot in the head causing a bullet to lodge in the region of his ear and jaw which bullet has not yet been removed. Amongst other contentions, it is claimed that the aforesaid is a violation of claimant's civil rights."

In their Answers to Interrogatories dated January 10, 1977, plaintiffs described the events surrounding the shooting as follows:

"Defendants and others forced plaintiff to stop his car, put him in fear of his life, manhandled, assaulted, harassed, aimed at and shot plaintiff, effectively confining him and depriving him of his personal liberty." Answer 39(b) (regarding false imprisonment claim).

In the Wasserman Affidavit (¶ 17), plaintiffs summarize their entire series of allegations concerning the circumstances of the shooting as follows:

"The plaintiff claims that the federal and state police officers accosted his vehicle and surrounded it brandishing drawn weapons, yelling and cussing profanities and ominous threats of physical harm."

Finally, an excerpt from the statement of Bradley dated March 4, 1974, reveals the following:

"Special Agent Bradley had his DEA badge in his left hand and his service weapon in his right hand. Special Agent Bradley heard shouts of 'Federal Agent and State Police' as he came around the front of L–15. Special Agent Bradley was standing about eight to ten feet from the left front of the subject vehicle. Special Agent Bradley heard Group Supervisor Boccia shouting for the driver to get out of the car, at the same time Special Agent Bradley also yelled 'Federal Agent.' Special Agent Bradley observed the driver begin nodding his head up and down as if assenting to the command. The vehicle then accelerated forward at Special Agent Bradley, in what Special Agent Bradley believed to be an attempt to run him down. The vehicle struck Special Agent Bradley along his lower left side, as he attempted to avoid the vehicle. The impact lifted Special Agent Bradley off his feet and knocked him backwards. While he was being knocked backwards and still in the air, his service weapon discharged with the round striking the driver's window. Special Agent Bradley recalls not firing the weapon intentionally or taking aim with the weapon. He is not sure whether it was a reflex action or an accidental discharge from being struck by the vehicle."

This version is repeated in Bradley's testimony before the Grand Jury of Hudson County, New Jersey, on March 13, 1974. Again describing what occurred at the time of the shooting, Bradley said:

"The car came at me, I was maybe eight feet from it, it had stopped or where I had to be the car came at me, I see it came at best I could do was to try to avoid it.

"Q. Your gun in your hand?

"A. The gun was in my hand and my badge was in my other hand, there isn't much I could do but jump back and in trying to step back at the same time trying to get out of the way of the car trying to keep myself from getting hit by the car. The next thing I know I'm off the ground being lifted by the car, now I'm hit, someplace down here and being lifted back off the ground. (T210–5 to 15).

\*     \*     \*     \*     \*     \*

"A. After the car had hit me and lifted me up off the ground, I know the gun went off in my hand. I don't recall pulling the trigger on the gun. I don't recall aiming that gun at him. But I know by being hit by the car the gun was discharged. (T211–20 to 24).

\*     \*     \*     \*     \*     \*

"Q. Is there any way you can recall whereby you thought at all before the trigger was pulled?

"A. No, primarily my idea then was to get away from that car. (T212–19 to 22).

\*     \*     \*     \*     \*     \*

"Q. How are you able to know, how were you able to actually pull that trigger and apply the pound pressure it required in order to get that bullet out of—expelled out of the chamber?

"A. The only way I could explain it like it was fear of being struck by that car caused me reflection action and tension of my whole body, and the idea of being driven back by the car. All I know I don't recall intentionally trying to squeeze that gun. I don't recall that I ever aimed the gun right at the person like that, but putting it out in front of me. All I know I was driven back and I tensed up and I don't recall trying to fire the gun at all. (T213–11 to 22)."

Based on the foregoing and other statements of the facts, the United States claims the action against it sounds in intentional

tort and hence is barred by sovereign immunity.

The government's first ground of attack is based on what it claims is plaintiffs' "negligence" theory as espoused in their attorney's affidavit:

"Plaintiff's counsel have consulted with experts in police procedures and they have reviewed the facts as developed in the depositions and grand jury testimony as well as in the documents that have been produced. Plaintiff's experts hold the view that the federal defendants' course of conduct that ultimately resulted in the injuries, is directly attributable to their failure to make a positive identification of CARMINE RICCA as John Patrick Tully. This failure, in light of the fact that they had the opportunity, means and wherewithal to do so was only one of the defendants' substantial departures from good and accepted law enforcement procedures. Indeed, the negligent conduct of the moving defendants can be traced back to the first moment that they received the informant's confidential tip. From that first official act in speaking with the informant up until and culminating in the shooting of CARMINE RICCA there were numerous departures from the Drug Enforcement Administration's own procedures as set forth in their manual as well as departures from other good and accepted police practice. *These numerous misdeeds by the moving defendants and their associates,* disclosed in the deposition transcripts and grand jury testimony *will support the opinion of plaintiff's police experts that the moving defendants had negligently failed to perform their duties properly. But for that series of negligent acts plaintiff's injuries would not have been sustained.* Hence, a fundamental factual issue in need of determination is present. (Emphasis added.)" Wasserman Aff., ¶ 13.

The government contends this claim is one for alleged negligence in failing to follow proper police procedure and, as such, has been consistently held barred by § 2680(h) as arising out of assault, false arrest, false imprisonment, malicious prosecution and

the like. See, *e. g., Gaudet v. United States, supra; United States v. Faneca,* 332 F.2d 872 (5th Cir. 1964); *Smith v. United States,* 330 F.Supp. 867 (E.D.Mich.1971); *Pendarvis v. United States,* 241 F.Supp. 8 (E.D.S.C.1965); *Nichols v. United States,* 236 F.Supp. 260 (N.D.Miss.1964). See also *Klein v. United States,* 268 F.2d 63 (2d Cir. 1959); *Collins v. United States,* 259 F.Supp. 363 (E.D.Pa.1966).

Although the issue is a close one, further development of the record is required before it can be conclusively held that the substance of plaintiffs' claim is that defendants committed an intentional tort barring suit against the government or, put another way, that the "character of the act is so predominantly intentional that the negligence as a causal force is virtually nonexistent." *Naisbitt v. United States,* 611 F.2d 1350 (10th Cir. 1980). Since the Federal Rules permit pleading in the alternative, Rule 8(e)(2), F.R.Civ.P., and a plaintiff may proceed to trial under alternative theories of recovery, see *Cooley v. Salopian Industries, Ltd.,* 383 F.Supp. 1114 (D.S.C.1974), the court is of opinion that awaiting further development of the record is not inconsistent with the government's desire to expose plaintiffs' action for what it is.

Under the government's view of the case, the gravamen of plaintiffs' claim is that the conduct *leading to* the confrontation amounts to a claim of lack of proper police procedure or, in other words, a claim for assault, false imprisonment and false arrest. It follows, under this theory, that since the shooting "arose out of" or "flowed directly" from this claim of false arrest, the action is barred on whatever theory brought. While conceding that the initial attempt to detain Ricca was intentional, the federal agents contend that applicable principles of law do not support such a narrow view of liability under § 2680(h).

They argue that when the cases refer to examining "the substance of the claim" a court must look for the nexus between defendants' actions and plaintiff's injuries. Applying this theory, the federal defend-

ants contend the substance of plaintiffs' claim involves not the events leading to defendants' attempt to detain Ricca, which they suggest are collateral to the heart of the action, but the conduct surrounding the actual shooting incident. For this part of the motion, the federal agents argue that this conduct must be analyzed as a discrete—and disputed—claim of assault and battery. Further claiming the government has failed on this motion to meet its burden of proving that the defendants acted with the requisite mental state for commission of such an intentional tort, these defendants urge denial of the government's motion. They cite *Gibson v. United States*, 457 F.2d 1391 (3d Cir. 1972); *Tastor v. United States*, 124 F.Supp. 548 (N.D.Cal.1954); and *Thiele v. State*, 30 Colo.App. 491, 495 P.2d 558 (1972), for support.

On the record before the court, we are constrained to agree with the federal defendants notwithstanding the government's argument that the actual shooting of plaintiff, if tortious and not privileged, is a battery as a matter of substantive law and therefore the claims against it are barred under § 2680(h). Conceding there is an issue as to whether agent Bradley intended to pull the trigger in the shooting of Ricca, the government proposes a beguilingly simple view: it suggests that to commit a battery an actor need not have the specific intent to cause harm or even touch another person. Rather, the United States claims the intent required is that to cause a harmful or offensive contact or to place another in an imminent apprehension of such a contact. The government then suggests that a battery is committed if the actor merely intends to place another in imminent apprehension of harmful contact and negligence

actually causes the harmful contact. It supports this argument with a citation to the Restatement Second of Torts §§ 13, 16, quoted in the margin.[1]

Plaintiffs and the individual defendants oppose this theory on the ground that the record is bare of evidence that the agents had the intent either to cause a harmful contact with Ricca or to place him in imminent apprehension of bodily harm, and review of the record bears out their contention. Thus, assuming the United States would not be liable if the agents acted with the intent to cause a harmful contact with plaintiff or with the intent to place him in imminent apprehension of such contact, the record is insufficient to sustain a dismissal at this time.

We are particularly persuaded by the federal agents' argument that no conclusive inference of intent to commit assault and battery can be drawn from the fact, standing alone, that the agents had drawn their weapons when they approached Ricca and attempted to subdue him. It is conceded that the individual defendants believed the man they were attempting to detain was an armed and dangerous fugitive. Thus, the inference that defendants intended to prevent plaintiff from taking offensive action against them and acted in self defense is as plausible as one that they intended to commit an assault and battery on Ricca. In these circumstances, since defendants' mental state is a material fact, see 1 Harper & James, The Law of Torts §§ 3.3, 3.4 (1956); 2 Jayson, Handling Federal Tort Claims § 260.02, at 13–37 (1978), there are genuine issues precluding a summary judgment in favor of the United States on plaintiff's second cause of action.

1. *Restatement Second of Torts* § 13 defines battery as follows:
"Battery: Harmful Contact
"An actor is subject to liability to another for battery if
"(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
"(b) a harmful contact with the person of the other directly or indirectly results."

And § 16 provides as follows:
"Character of Intent Necessary
"(1) If an act is done with the intention of inflicting upon another an offensive but not a harmful bodily contact, or of putting another in apprehension of either a harmful or offensive bodily contact, and such act causes a bodily contact to the other, the actor is liable although the act was not done with the intention of bringing the resulting bodily harm."

The government's citation of authority does not require a different result. Each case involved a *deliberate* act or acts, and their holdings—that a claim of negligence preceding, based on or arising out of such acts does not circumvent § 2680(h)—are not inconsistent with the theory we adopt in the circumstances of this case. In *Klein v. United States, supra,* 268 F.2d 63, for example, the gravamen of the claim was an allegedly illegal and intentional detention from which adverse consequences to plaintiff flowed. The plaintiff in *Pendarvis v. United States, supra,* 241 F.Supp. 8, complained of a negligent erroneous arrest. The court found that the substance of the claim was excessive force used in arresting plaintiff: his answer to interrogatories stated that he was attacked and struck over the head by a band of army soldiers. And in *Gaudet v. United States, supra,* 517 F.2d 1034, it appears that the agents' actions were in all respects intentional. See also *United States v. Faneca, supra* (firing of gas cannisters at plaintiff); *Smith v. United States, supra* (shots fired by National Guardsmen quelling riot); *Nichols v. United States, supra* (firing of tear gas); *Collins v. United States, supra* (claim of negligence in hiring and retaining employee who attacked plaintiff).

Here, on the other hand, we have determined that the substance of plaintiffs' claim for purposes of the government's motion is the assault and battery allegedly committed when Ricca was shot. Unlike the cases offered by the government, the claim is made that the shooting was entirely accidental and shares none of the qualities of deliberate action necessary to relieve the United States of possible liability in these circumstances. Since the government has not met its burden of proving defendants' intent to commit an assault and battery, its motion for summary judgment on plaintiffs' second cause of action must be denied.

Turning now to the remaining issues raised by the United States' motion, we note that certain portions have not been opposed and, because of the merit of the government's position, summary judgment is appropriate at this time. Accordingly, the entire action against the DEA must be dismissed since Congress has not authorized suits against it. See *Blackmar v. Guerre,* 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534 (1952). Moreover, plaintiffs' first and third causes of action, alleging assault, battery and false imprisonment must be dismissed against the United States because of the limitation of § 2680(h) of the Federal Tort Claims Act. Plaintiffs' sixth, seventh and eighth causes of action alleging claims based on infringement of Fourth, Fifth and Fourteenth Amendment rights must also be dismissed because of the United States' sovereign immunity from such claims. See *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 410, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619 (1971). *Cf. Birnbaum v. United States,* 588 F.2d 319, 327–28 (2d Cir. 1978).

The Fourteenth Amendment and 42 U.S.C. § 1983 are inapplicable to the federal government, *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), and therefore plaintiffs' fourth and eighth causes of action must also be dismissed on this ground. The United States, moreover, has not waived its immunity from suit under 42 U.S.C. §§ 1983, 1985(3), even for claims not barred by § 2680(h) of the Federal Tort Claims Act. See *Morpurgo v. Board of Higher Education,* 423 F.Supp. 704, 711, 714 (S.D.N.Y. 1976); the fourth and ninth causes of action must be dismissed on this ground. And plaintiff's ninth cause must be dismissed on the additional ground that the allegations fall short of claiming class-based discriminatory animus sufficient to maintain a claim under 42 U.S.C. § 1985(3). See *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Ellentuck v. Klein,* 570 F.2d 414 (2d Cir. 1978); *Regan v. Sullivan,* 557 F.2d 300 (2d Cir. 1977); *Perrotta v. Irizarry,* 430 F.Supp. 1274 (S.D.N.Y.), *aff'd,* 573 F.2d 1294 (2d Cir. 1977); *Morpurgo v. Board of Higher Education, supra.*

Finally, the United States is not liable for punitive damages and therefore

plaintiffs' tenth cause of action must be dismissed as against the United States. See 28 U.S.C. § 2674. In summary, the entire action against the DEA is dismissed; and plaintiffs' first, third, fourth, sixth, seventh, eighth, ninth and tenth causes of action are dismissed as against the United States. The complaint remains standing as to the United States under plaintiffs' second cause of action to the extent they seek relief based on defendants' negligence.[2]

The individual federal defendants have also moved to dismiss the complaint on various grounds. They claim an absolute immunity from State common law suits such as those pleaded in plaintiffs' first (assault and battery), second (negligence), third (false imprisonment) and eleventh (loss of consortium) causes of action. For this proposition, these defendants cite cases that find qualified immunity appropriate for claims of constitutional deprivations but appear to recognize the vitality of the absolute immunity doctrine of *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), for common law claims. See, *e. g.*, *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Birnbaum v. United States supra*; *Granger v. Marek*, 583 F.2d 781 (6th Cir. 1978). While there is little doubt that *Barr v. Matteo* has survived the recent immunity decisions of the Supreme Court—most recently in *Ferri v. Ackerman*, 444 U.S. 193, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979) (*Barr* quoted with approval but found inapplicable in the circumstances)—its application to federal law enforcement officials sued in tort on both common law and constitutional theories of recovery is not so clear.

At common law, police officers were never extended absolute immunity from suit. *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct.

1213, 1218, 18 L.Ed.2d 288 (1967); *Bivens v. Six Unknown Named Agents, supra*, 456 F.2d at 1346; 3 K. Davis, Administrative Law Treatise § 26.03, at 520 (1958). In determining the scope of immunity available to federal law officers sued for constitutional violations, the *Bivens* court reached the same conclusion by employing traditional immunity principles and the "fiction" that police officers were not discretionary officials for immunity purposes. The court stated it maintained this fiction because of its judgment that the threat of suit does not deter vigorous police action to the extent of outweighing the protection of personal liberties by tort action against police misconduct. 456 F.2d at 1346. See also *Carter v. Carlson*, 447 F.2d 358, 363 n.9 (D.C.Cir.1971), *rev'd on other grounds*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

In these circumstances, the federal defendants' quotation from *Birnbaum v. United States, supra*, 588 F.2d at 332, hardly disposes of the issue of the nature and extent of the agents' immunity from suit, if any. There the court stated:

"[W]hile, as federal agents, the CIA personnel *may* still have an absolute immunity from state suits, *Butz v. Economou*, 438 U.S. 478, 495 & n.22, 98 S.Ct. 2894, 2905 & n.22, 57 L.Ed.2d 895 (1978); *Granger v. Marek*, 583 F.2d 781 (6th Cir. 1978); see *Howard v. Lyons*, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959), the CIA agents' qualified immunity in federal constitutional suits arising out of this set of circumstances, see *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), may well not protect them if it be found that their mail openings were 'unconstitutional action on a massive scale.' *Economou*, 438 U.S. at 505, 98 S.Ct. at 2910." (Emphasis added.)

---

2. The government appears to concede plaintiffs' loss of consortium claim (eleventh cause of action) must remain standing under the circumstances. The Federal Tort Claims Act, on the other hand, does not provide an independent cause of action. It merely waives the sovereign immunity of the United States and makes the government liable "in the same

manner and to the same extent as a private individual under like circumstances . . . ." *Feres v. United States*, 340 U.S. 135, 141, 71 S.Ct. 153, 157, 95 L.Ed. 152 (1950), quoting from 28 U.S.C. § 2674. Accordingly, plaintiffs' causes of action asserted under the Act are deficient and must be dismissed.

Thus, while courts have in the past granted and, no doubt, will continue to grant federal officials absolute immunity from certain common law suits, such immunity cannot be applied without some inquiry into the need of the immunity to forward legitimate purposes of the office.

In *Ferri v. Ackerman, supra,* for example, the Court found the federal officer immunity doctrine inapplicable to defense counsel appointed under the Criminal Justice Act of 1964 when sued for malpractice. In determining whether there was an acceptable justification for immunity in the case, the Court examined the nature of counsel's activities and the threat of a malpractice claim on the performance of his duties. Finding counsel's responsibilities unlike those of other officers of the court who enjoy absolute immunity from certain suits, it concluded the primary rationale for such immunity was missing and the immunity doctrine therefore inapplicable. 100 S.Ct. at 408–10. The Court also noted that its discussion was confined to immunity in malpractice actions and left open the question whether defense counsel is immune from other kinds of tort suits, such as a defamation action brought by someone other than his client. *Id.* 100 S.Ct. at 409 n.22. Applying these principles, we are left with some doubt that the qualified immunity traditionally enjoyed by law enforcement officers is insufficient to protect them and the public's interest in vigorous police work.

The parameters and details of constitutional tort actions are shaped by reference to the parallel common law. *Dellums v. Powell,* 566 F.2d 167, 175 (D.C.Cir. 1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3147, 57 L.Ed.2d 1161 (1978), *citing Pierson v. Ray, supra,* 386 U.S. at 556–57, 87 S.Ct. at 1219. Thus, since qualified immunity has been deemed adequate for law enforcement officials charged with constitutional violations, *Pierson v. Ray, supra* ; *Bivens v. Six Unknown Named Agents, supra,* 456 F.2d 1339, it would appear that a different rule

for common law claims arising out of a single incident might merely lead to confusion, see *Dellums v. Powell, supra,* 566 F.2d at 176, and incongruous results without significantly advancing the purposes of the immunity doctrine.

First, it is possible that absolute immunity for the federal defendants on the common law claims might in the circumstances of this case lead to possible unfairness. If, for example, it is determined that these agents are not liable for punitive damages in the *Bivens* causes of action as they contend, but see *Carlson v. Green,* —— U.S. ——, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), the State defendants might be liable for such damages on the common law claims, assuming State law permits it, while their partners in the incident—and the agent who is alleged to have shot Ricca— are not so responsible. Second, it also seems incongruous that the federal defendants would be required to defend, presumably on good faith grounds, against a charge that their conduct arising out of the shooting incident violated Ricca's constitutional rights while at the same time would not have to meet charges of common law assault, battery and false imprisonment arising out of the same incident. See *Dellums v. Powell, supra,* 566 F.2d at 175–76.

We need not decide this question now, however, since it is conceded that the federal agents must proceed to trial on the *Bivens* causes of action and defend on the basis of their claim of good faith immunity. Accordingly, decision is reserved on the scope of the immunity to be afforded the federal defendants until such time as resolution of the issue becomes necessary.[3]

Plaintiffs' fourth and eighth causes of action asserting claims under 42 U.S.C. § 1983 and the Fourteenth Amendment, on the other hand, must be dismissed as against the federal defendants because applicable only to the State and to State action. See *District of Columbia v. Carter, supra* ; *Bivens v. Six Unknown Named*

---

**3.** And also, under the circumstances, on the question of recovery of punitive damages in the *Bivens* causes of action. See *Carlson v. Green,*

*supra,* —— U.S. at ——, 100 S.Ct. at 1473 & dissenting opinion of Rehnquist, J., at ——, 100 S.Ct. at 1486.

*Agents, supra,* 456 F.2d at 1346.[4] Plaintiffs' ninth cause of action alleging a violation of 42 U.S.C. § 1985(3) is defective as against the federal agents for the reasons stated above. The Federal Tort Claims Act provides a waiver of sovereign immunity but provides no basis for a cause of action against individual government employees and thus the fifth cause must be dismissed as to them.

Finally, the Supreme Court recently recognized that in certain circumstances a cause of action may be brought directly under the Fifth Amendment. *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). The Court of Appeals for this circuit thereafter found it appropriate to permit a *Bivens* plaintiff alleging a claim of cruel and unusual punishment arising under the Eighth Amendment to amend his complaint to include a claim based on the Fifth Amendment. *Hernandez v. Lattimore,* 612 F.2d 61 (2d Cir. 1979). The court found neither the existence of a remedy under the Federal Tort Claims Act nor a *Bivens* action precluded prosecution of the Fifth Amendment claim. In these circumstances, plaintiffs' seventh cause of action is sufficient to withstand a motion for summary judgment by the federal agents. See also *Carlson v. Green, supra.*

To summarize the court's action with respect to the individual federal defendants, plaintiffs' fourth, fifth, eighth and ninth causes of action are dismissed. The extent of defendants' immunity from the common law causes of actions will be reserved until trial as well as their liability for punitive damages in the *Bivens* causes. The remaining causes of action will proceed to trial subject to all available defenses.

SO ORDERED.

---

**4.** Plaintiffs' contention that the federal government's involvement in State activities is sufficient to make it responsible for claims asserted under 42 U.S.C. § 1983 and the Fourteenth Amendment, see *Kletschka v. Driver,* 411 F.2d 436 (2d Cir. 1969), *citing Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), is wholly unsupported by the record and without merit.